[Civ. No. 14246. Second Dist., Div. One. Dec. 22, 1944.]

A. J. NEWMAN, Appellant, v. FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY (a Corporation),. Respondent.

A. J. Newman, in pro. per., Claude A. Watson and Bernard Brennan for Appellant.

Hindman & Davis for Respondent.

THE COURT.—Appellant as plaintiff in the court below instituted an action against respondent as defendant to recover for loss caused by fire, on an insurance policy issued by the defendant company. After a trial by the court judgment was rendered against appellant and in favor of respondent; and appellant has appealed from the judgment so rendered.

The insurance policy in question was written on a standard form for fire insurance in California; and the insured was named therein as Dr. A. J. Newman, who is the appellant. The total amount of the insurance was $3,000, $2,000 thereof covering the dwelling house at 6200 Buena Vista Terrace, in the city of Los Angeles, and $1,000 thereof covering household furniture and personal property at the same address. The period of the policy was from noon, September 20, 1940, to noon, September 20, 1943. The fire which is claimed to have caused the loss, for which appellant seeks recovery under the policy in question, occurred on September 16, 1941. In the answer to the complaint herein respondent admitted the occurrence of the fire, but denied the loss as claimed by appellant and set up three separate defenses. The first and second separate defenses were based on the following provision of the policy: "This entire policy shall be void, (a) if the insured has concealed or misrepresented any material

facts or circumstances concerning this insurance or the subject thereof; or (b) in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.'' Respondent's first separate defense included the following paragraphs.

## "II

"That prior to the execution and delivery of said policy, this defendant had insured plaintiff under the name of 'Jacob Newman' for loss by fire to building and contents allegedly located at #976 Pine Grove, Los Angeles, California; that in the years 1937 and 1939, plaintiff so insured under the name of 'Jacob Newman' claimed loss and damage by fire to said property against this defendant under said policy; that this defendant paid the plaintiff the loss claimed by the fire of 1937, but that under claim made for loss in 1939, this defendant, by reason, among other reasons, of the fact that plaintiff had included in his claim various and sundry items which were claimed lost and damaged by the fire of 1937 in claim made thereon, resisted said claim, and thereafter compromised the same and cancelled said policy and notified plaintiff that no insurance would be granted by this defendant company to plaintiff thereafter.

## "III

"That plaintiff applied to an agent of this defendant representing Pittsburgh Underwriters Department of this defendant for the policy of insurance sued upon herein, for insurance, insuring him in the name of 'Dr. A. J. Newman', representing to said Agent that he was a doctor and entitled to said insurance; plaintiff represented the location of said property to be#6200 Buena Vista Terrace, and represented his true name to be 'Dr. A. J. Newman'; that the location of #6200 Buena Vista Terrace and the building situate thereat is the same location as #976 Pine Grove, Los Angeles, California, and the building located thereat the same as that located or claimed to have been located at #976 Pine Grove, Los Angeles, California, and plaintiff herein is the same person as the person representing himself previously as 'Jacob Newman', and the property for which loss is claimed herein is the same property alleged damaged and destroyed by fire in the losses of 1937 and 1939.

## "IV

"That plaintiff, in so applying for said insurance, concealed from this defendant material facts, to-wit: That the property attempted to be described in the policy of insurance in the policy in suit herein as #6200 Buena Vista Terrace was the same property and the location the same as that which he had previously described as the property located at 976 Pine Grove, Los Angeles, California, and that he, 'Dr A. J. Newman', was the same person who had previously represented himself to be 'Jacob Newman', and the property for which loss is claimed herein is the same property alleged damaged and destroyed by the fire in the losses of 1937 and 1939."

The second separate defense was based upon certain alleged and specified false statements made by appellant in connection with his claim of loss. The third separate defense was based upon appellant's alleged refusal to answer questions concerning material matters relating to said insurance and the subject thereof, and, as to other matters, making false and evasive answers, thereby preventing a complete examination. This last defense is based upon a provision of the policy reading, "and the insured shall exhibit to any person designated in writing by this company all that remains of any property herein described, and shall submit to examination under oath, as often as required by any such person, and subscribe to the testimony so given."

The trial court found all of the allegations of the foregoing separate defenses to be true. Appellant contends that there is not sufficient evidence to support such findings, and that there is also insufficient evidence to support a finding against appellant's allegation of total loss. Appellant also contends that the decision of the trial court is contrary to law.

In regard to the allegation contained in paragraph II of the first separate defense, to the effect that the defendant company "cancelled said policy and notified plaintiff that no insurance would be granted by this defendant company to plaintiff thereafter," the only evidence found in the record upon this subject is that given by the superintendent of the fire division of respondent's organization, as follows: "Our record shows we had a policy for Jacob Newman, 976 Pine Grove Avenue, and that we had to take a loss sometime in 1939, I believe, and that we subsequently paid another loss.

And at the request of the Los Angeles Department, or, on the information, rather, of the Los Angeles Department to me—— we have what we call a K.O.; that is 'Keep Off', we had marked our records not to accept any further insurance from Jacob Newman for 976 Pine Grove Avenue.'' There appears to be no evidence that the previous policy was cancelled or that appellant was notified that no insurance would be granted to him thereafter. The testimony just quoted is merely to the effect that respondent's records were marked for the purpose of avoiding acceptance of any further insurance from appellant for 976 Pine Grove Avenue. The testimony merely refers to what appears to have been an interoffice or interdepartmental communication within respondent's organization, and a matter only within the knowledge of respondent's agents, servants, or employees, and not one communicated to appellant. In any event, such evidence does not support a finding that the previous policy had been cancelled and appellant had been notified that no further insurance would be granted him by respondent.

Appellant testified that he used the name of Dr. Jacob Newman and the name of Dr. A. J. Newman. It is not disputed by respondent that appellant is known as ''Dr. A. J. Newman.'' In this connection, there was offered and received in evidence on behalf of respondent, a document entitled ''Agreement for Submission to Appraisers,'' which had been executed by appellant in connection with the claim of loss for the fire occurring in 1939. At the end of this document two signatures appear; the first, ''Alfred J. Newman''; and directly under the first signature appears the signature ''Jacob Newman.'' The deposition of appellant taken with reference to the fire occurring February 17, 1939, introduced in evidence in the present case on behalf of respondent, was signed ''Alfred J. Newman.'' According to the record, appellant was known as Alfred Jacob Newman and also as Jacob Newman. Appellant testified that his full name was Alfred Jacob Newman. The trial court found it to be true that the property in question was known as number 6200 Buena Vista Terrace. The following testimony was given by appellant as to the address: ''Q. Where do you live? A. The legal description is 976 Pine Grove Avenue, Los Angeles. Q. What do you mean by legal description? A. The property cannot be reached easily from the north, to get off, so I advertise it as 6200 Buena Vista Terrace. Q. Has the

city government at any time fixed any name for that street?
A. Yes, Pine Grove. Q. What number on Buena Vista?
A. 6200. Q. Is it on the corner? A. It is in the middle of
nowhere; a mountain and canyon on one side and a canyon
on the other side.'' It appears from the testimony of re-
spondent's superintendent that respondent, insurer, had a
record of the location of 976 Pine Grove Avenue.

As to the matter of misrepresentation and concealment on
the part of appellant in obtaining the policy of insurance on
which the present suit is based, respondent states in its brief
that the facts were admitted by appellant in his testimony.
Appellant gave the following testimony regarding the cir-
cumstances under which appellant ordered the policy in
question.

''When you applied for this policy, you say over the tele-
phone, to Mrs. Lundeburg—— A. Yes. Q. ——had you
previously discussed insurance with her? A. No, sir; not at
all. Q. How did you know she was in the insurance business?
A. I asked the exchange that I belonged to to recommend me
to an insurance broker who was a member of the exchange,
and they gave me her name and address; and I called her up
and asked her to issue a policy. Q. Now, you hadn't met her
previously? A. No, sir; I don't believe I ever met her at all.
Q. When you called her up, did you tell her your name was
Dr. A. J. Newman? A. That's right. I probably told her
Dr. Newman was calling and she asked me for the initials,
and I must have given her A. J. Q. You are not a doctor?
A. I have several titles of doctor, as Doctor of osteopathy,
chiropractics, naturopathy, and Doctor of Divinity, and sev-
eral others. . . . Q. When you called up Mrs. Lundeburg,
you told her you were Dr. A. J. Newman and wanted insur-
ance? A. No; I said, 'Dr. Newman calling, and I want in-
surance,' She said, 'What are your initials' And I said, 'My
initials are A. J.' Q. You told her how much insurance you
wanted? A. I must have. Q. Well, you would remember
that? A. Oh, yes. Q. Did you tell her how much the build-
ing was worth? A. I don't think so. Q. Tell her—— A. There
was no discussion. I just told her I wanted $2000 on the
house. Maybe she asked what I wanted, and I thought that
would be sufficient. Q. You gave her the address at 6200
Buena Vista? A. That's right. Q. And told her what kind
of house it was? A. Well, I don't know whether she ques-

tioned it. I think she must have asked me whether it was a brick house or frame dwelling. It shows that on the policy. She must have asked. Q. ——I am asking you your recollection. A. I can't remember the details. Q. And you received the policy through the mail? A. Yes, sir. I don't remember exactly, but I think it came by mail, because I never met the lady at all personally." It does not appear from the evidence that appellant requested insurance in respondent company or that appellant knew or was aware that the agent from whom appellant ordered the policy was agent for respondent.

The record is devoid of any evidence from which there might be inferred an intent on the part of appellant to practice deception, either with respect to appellant's identity or with respect to the identity of appellant's property. ▪ However, an intent to deceive is not essential in such cases. (*Telford* v. *New York Life Ins. Co.*, 9 Cal.2d 103 [69 P.2d 835].) The matter of concealment of material facts in applying for a policy of insurance is governed by the provisions of article I of chapter 3, part 1, division 1, of the Insurance Code. Section 330 thereof gives the definition of concealment: "Neglect to communicate that which a party knows, and ought to communicate, is concealment." Section 332 provides: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." Section 333 reads in part as follows: "Neither party to a contract of insurance is bound to communicate information of the matters following, except in answer to the inquiries of the other: 1. Those which the other knows. 2. Those which, in the exercise of ordinary care, the other ought to know, and of which the party has no reason to suppose him ignorant. . . ." Section 334 sets forth the test of materiality. "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, informing his estimate of the disadvantages of the proposed contract, or in making his inquiries." Section 335 provides in part: "Each party to a contract of insurance is bound to know: (a) All the general causes which are open to his inquiry equally with that of the other, and which may affect either the political or material perils contemplated."

The facts stated to respondent's agent by appellant, in

applying for fire insurance, were not false. The evidence shows that appellant was known as "Dr. A. J. Newman." As a matter of fact, from all that appears in the record, it cannot be definitely determined that appellant was not entitiled to use the title of doctor; although this question is not material to the risk involved here. It is sufficient for the purposes of the present case to note that appellant was known by such title, or used such title. The evidence reveals, and the court found that the property in question was known by the street number 6200 Buena Vista Terrace; although it appears also to have been known, and perhaps more accurately, as 976 Pine Grove. No inquiry was made of appellant as to previous loss experience or as to further identity of the property or a more specific description of the location thereof, or as to further identity of appellant personally. There is no evidence that appellant knew that he and his property had been placed on respondent's "Keep Off" list; and there is no evidence from which it can be reasonably inferred that appellant suspected he had been so listed. Mere evidence of a prior dispute over a loss and a compromise thereof would furnish no reasonable ground for supposing respondent would refuse to provide future coverage of the property. The settlement of the claim might, if anything, tend to lead appellant to believe his claim to have been just, and that respondent had admitted its mistake in first denying the claim. From all that appears in the evidence, appellant was ignorant of the fact which made his prior loss a material matter, and which made disclosure of the allegedly concealed facts material, namely, that respondent had placed the risk in its "Keep Off" file, and that respondent no longer desired to cover the risk. Were it not for the fact that respondent had so listed the risk involved, there would be no reason for appellant to have disclosed the prior address and loss, and the fact that appellant was the same person as Jacob Newman, unless the law imposes such a duty on an applicant for fire insurance under the circumstances. The question, therefore, is whether there is a duty on the part of an applicant for fire insurance to give information disclosing prior losses, in the absence of an inquiry on the subject.

A case closely analogous to the present case is that of *E. A. Boyd Co.* v. *United States Fidelity & Guaranty Co.*, 35 Cal. App.2d 171 [94 P.2d 1046] (hearing denied by Supreme Court), wherein an employee who had been previously guilty

of embezzlement was included in the coverage of a fidelity bond. The employer knew that the employee had been guilty of embezzlement, which offense had been committed in a former employment; but the defendant insurer had covered this previous loss. The employee's name had been added to the schedule of coverage under the fidelity bond as Merwin L. Devin. The insurer had the name of M. L. Devin in its records as a former embezzler, when an employee of the Bank of America; and the insurer also had a record of having paid a part of the bank's loss on that account. Under such circumstances the court held the defendant insurer charged with knowledge of the former embezzlement; and it is stated in the opinion that the fact that the name appeared on the records of the insurer as M. L. Devin instead of Merwin L. Devin was not material.

At page 180, *ibidem,* it is stated: ''Where the bond contains no clause rendering it void for former defalcations of an assured person and no questions are asked of the insured regarding the character or honesty of a bonded employee, and no misstatements are made regarding material facts, the failure to voluntarily disclose the fact that the employer knew of a previous charge involving the dishonesty of an employee which occurred seven years before the application is made to bond him may not cause the insured to be charged with fraud or concealment which will render the bond void, particularly when the insurer is possessed of facts which should place a reasonably prudent person on inquiry regarding that offense, or omission. [cases and authorities cited.] '' The court then quotes from 3 Cooley's Briefs on Insurance, 2d edition, stating: ''In the authority last cited, at page 1970, after reviewing the authorities concerning undisclosed statements, it is said: 'From these cases the rule may be deduced that facts which the insurer knows, *or which he is bound to know, and may therefore be presumed to know, need not be disclosed.*' '' (Italics included.)

It is true that the decision in the Boyd case, last cited, was placed upon the ground of an estoppel operating against the insurer. But the court in that case also held that what had been said regarding the estoppel of the insurance company, which was created by its knowledge of the uncommunicated facts, did not conflict with the provisions of the Insurance Code, above quoted. Moreover, the facts and circumstances presented in the Boyd case were such as to have warranted

a decision in that case based solely upon authority of the pertinent provisions of the Insurance Code.

In the present case, as has already been pointed out, there was no misstatement of facts. There was merely a failure on the part of appellant to reveal that he was the same person as Jacob Newman and that 6200 Buena Vista Terrace was the same premises as 976 Pine Grove Avenue. From all that appears in the record, respondent had the means of ascertaining the uncommunicated facts; and, under the circumstances presented, the facts in question were such as could have been ascertained by respondent in the exercise of ordinary care. There is no evidence in the record on which to base an inference that appellant supposed respondent to be ignorant of the facts left undisclosed, or from which to infer that appellant had any reason to suppose respondent ignorant of such facts. In the absence of inquiry, therefore, appellant was not bound to disclose such facts upon applying for the fire insurance involved. (Ins. Code, §§ 332, 333 and 335, *supra.*) Cases cited by respondent upon the question of concealment are all distinguishable from the present case upon the facts.

However, in regard to the second separate defense and the findings thereon, the record reveals that the testimony of appellant upon cross-examination, with respect to items of personal property for which he claimed a loss, was generally vague; and appellant frequently professed a failure to remember the source from which, or the time when many of the articles were acquired. In view of the fact that the loss which formed the basis of appellant's present suit was the third loss by fire on the premises in question, and that a number of items claimed by appellant as lost in the present case were identical or similar to items claimed as lost in the previous fire, it was material for respondent to obtain information which would serve to differentiate between items previously claimed as lost and the items claimed as lost in the present instance. One such item was that of dishes. In connection with the proof of loss for the second fire, which occurred on February 17, 1939, claim was made for total loss in the sum of $7.50 for one set of dishes, and in the sum of $50, as a total loss, for one lot of dishes and utensils. There was also a claim as for a complete loss of dishes, in the present case, also in the sum of $50. The same situation occurred with regard to certain robes and other apparel, articles of furniture and

books. Appellant testified that between the second and the last fire, a period of about two years, he had acquired articles worth $15,000 or $20,000 or more. It should be mentioned here that the evidence of appellant's circumstances during this time, of his mode of living, his home and surroundings, was generally so inconsistent with such a statement that an inference of doubt as to the truth thereof would have been justified on the part of the trial court.

The following appears in the record as to the cross-examination of appellant: ''Q. Then you didn't acquire all these things in here between the second and third fires— in Defendant's Exhibit E—between the second and third fires? A. No, there were many articles that remained from the last fire, that were not destroyed. Q. You told us a minute ago that all of these articles were acquired between the dates of the second fire and the third fire? A. Not all. Q. I will hand you this list and then ask you to go over it and point out to me and the Court what of the articles listed in there you had at the time of the second fire. (Handing document to witness.) A. Well, I had the dishes. Q. You had the dishes? A. Yes, sir. Q. They weren't damaged or destroyed in the first fire or second? A. They were destroyed in the last. Q. I am asking you what in that list there, which of those items you had at the time of the second fire. A. The second or last? Q. The second. A. These dishes might have been new from the second fire—— between the second and third fires. Q. I am not asking you how you acquired $15,000 to $20,000 worth of merchandise in less than two years; I want to know whether any of the merchandise listed in there was merchandise you had on hand and saved from the second fire. A. I don't know whether the dishes were. Q. Did you save any dishes from the second fire? A. I don't remember. Q. Go through there and show me any of the articles that you had at the time of the second fire that you still had and were in good usable shape at the time of the third fire—— do you understand what I mean? A. Yes. Q. In other words, show me from that list the articles that you did not acquire between the time of the second and the third fires. A. Well, one or two beds. Q. By that you mean you saved one or two beds out of the first fire? A. I think so. Q. Tell me of your best recollection. A. That is as far as I can remember. I think a couple of the beds that were saved in the second fire remained—— there were so many beds in the house—— and the quilts, there might have

been a couple that were not destroyed in the second fire that were removed and destroyed in the last fire. Q. And when you say there might have been a couple—— A. Yes, I believe they were not all destroyed by fire. And some of the linens might have remained from the second fire. Q. Did they? A. I don't remember actually if they did save the linens. Then the portieres, they were acquired in the last year. This sewing machine I think I bought too in the last year. Q. You heard what I said—— I said, pick out what you had. A. A couple of dressers remained from the second fire. Q. Were those women's dresses or misses dresses? A. Dressers. Q. Oh, dressers? A. Yes. Q. What else? A. Gas heater—— a couple of gas heaters might have been there from before—— I think I had a half dozen of them. Q. Did you have a half dozen of them at the time of the second fire? A. No, I don't think so. At the time of the last fire I had a half a dozen; at the time of the second fire I might have had them. Q. You have two beds saved and two dressers saved from the second fire. Do you want to say some gas heaters were saved from the second fire? A. Might be. Q. Were they or were they not? A. I don't remember. Q. Go down the list. A. A silk robe and prayer robe. Q. How many silk robes? A. I think one of these silk robes was from Dr. Little. Q. That was saved? A. I can't remember them now, what I had there—— there were so many of them. And the carpet, the carpets were new, acquired in the last year. Books, there might have been some books saved from the second fire. . . . Q. At the time of the second fire, you claim you had two radios and that they were both destroyed by the fire, did you not? A. I don't remember. Q. I will hand you the list that you say was prepared under your direction—— A. Some tools might have been there from the second fire. Q. Let's get this matter of the radio straightened first: Well, I will let that go for the time being. A. I don't remember which ones were remaining and which were acquired during that year. Q. Talking about the radios now? A. Yes. Well, I don't know how many radios I had, or whether they were destroyed in the second fire, or whether they were acquired the year previous—— I might have saved something. I don't know. Q. Go on down the list and show us. A. I don't seem to find anything. Maybe an electric iron remained. But all these things were acquired in the last year before the fire. Might have been an electric heater saved from the last fire,

but I don't know. I can't make an absolute positive statement that they were. There was very little left from the second fire. THE COURT: Wait until he asks you a question. Q. By MR. DAVIS: This $15,000 and $20,000 worth of personal property that was contained in this house at the time of the last fire, you say has all, except these few articles you have mentioned, been acquired in a year? A. I think so.'' Under cross-examination appellant could not remember whether he had made claim for destruction of certain prayer robes after the second fire, as appears from the following quotation from the record: ''Q. You did buy at least three of these prayer robes from George Little? A. I think so. Q. Before the second fire? A. Yes, that must have been before the second fire. Q. And you made claims for the damage and destruction of those prayer robes after the second fire, did you? A. I don't remember. Q. I am asking you. A. I don't remember whether I did, or not.'' There was a claim for $75 made for prayer robes in the last fire; that is, part of the claim on which the present suit is based. In his proof of loss herein appellant claimed a whole loss of $8,000 for the contents of his dwelling. Appellant claimed a total loss of the building in the sum of $4,000. Appellant testified to having made extensive repairs and alterations to the building between the time of the second fire and the time of the last fire. Some of the alterations appear from appellant's testimony to have been rather elaborate. Appellant testified that he had made the house into one of eleven rooms instead of four rooms. He testified that the entire space of the house was 40 x 25. One of the improvements appellant claimed to have made to the house was the construction of a solarium on the roof, at a cost of about $150. Appellant also testified that he had built a picket fence on top of the house, around the roof. Photographs of the house were introduced in evidence on behalf of respondent. It was testified that these pictures depicted the condition observed at the premises immediately before the fire. It is to be noted that the picture which appears to show the entire expanse of the roof fails to reveal any evidence of a solarium or of a fence such as appellant claimed in his testimony to have constructed. The appearance of the building, from the photographs in evidence, would justify an inference that a value of $4,000 placed upon the house would be highly unreasonable. An insurance adjuster employed by respondent testified at the trial that after an examination of

the premises and an investigation of the fire he came to the conclusion that the loss and damage to the contents of the dwelling would not exceed $200, and that the loss and damage to the structure would amount to approximately $500 or $600.

There is sufficient evidence in the record to warrant an inference on the part of the trial court that the statements of appellant relative to the value of the real property involved and the statements relative to the claim for various items of property allegedly lost and damaged were not true. Whether such statements were made knowingly and with intent to defraud the insurer was a question of fact for the trial court to decide. (*Pedrotti* v. *American Nat. Fire Ins. Co.*, 90 Cal. App. 668 [266 P. 376]; *Singleton* v. *Hartford Fire Ins. Co.*, 127 Cal.App. 635 [16 P.2d 293].) Upon the evidence presented, an inference of intentional falsity was more reasonably consistent with the facts than an inference of good faith. It cannot be said, therefore, that the facts warrant any presumption of mistake or misapprehension on the part of the insured.

The evidence sustains the findings of the trial court to the effect that appellant knowingly and wilfully made claim for numerous and sundry items of property as totally lost and damaged by fire, which said items of property had been lost and destroyed by previous fires occurring in 1937 and 1939; that appellant knowingly, grossly overvalued each and every item for which claim was made in the documents presented in connection with the claim of loss, and in the examination with regard to the loss; and that appellant in his sworn proof of loss of January 9, 1942, swore that the loss on the building in question was $4,000, when in truth and in fact said loss and damage did not exceed $750; and that appellant made said statement with knowledge of the falsity thereof. Any one of the findings so made is sufficient to support the judgment.

In view of what has been said herein with respect to respondent's second separate defense, it is unnecessary to consider the third separate defense. In passing, however, it may be stated that such evidence as has been pointed out by the parties with respect to this defense does not appear sufficient to sustain the findings of the trial court in this respect.

For the foregoing reasons the judgment is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied February 19, 1945.